416 So.2d 258 (1982)
Ronnie L. FOREMAN, Plaintiff-Appellant,
v.
STATE FARM MUTUAL AUTOMOBILE INSURANCE, et al., Defendants-Appellees.
No. 8802.
Court of Appeal of Louisiana, Third Circuit.
May 26, 1982.
*259 Hunt, Godwin, Painter & Roddy, Ernest C. Hunt, Jr., Lake Charles, for plaintiff-appellant.
Stockwell, Sievert, Viccellio, Clements & Shaddock, John S. Bradford, Lake Charles, for defendants-appellees.
Before DOMENGEAUX, CUTRER and SWIFT, JJ.
CUTRER, Judge.
This is an appeal from a trial court judgment for damages arising out of an intersectional accident occurring in the city of Lake Charles, Louisiana, involving vehicles driven by Ronnie Foreman and David Trahan.
Foreman brought suit against State Farm Mutual Automobile Insurance Company (State Farm), the liability insurer of Trahan, for damages incurred as a result of an accident occurring on January 19, 1978, at the intersection of Ryan Street and Sale Road. A jury trial resulted in a verdict awarding Foreman $11,600.00 in damages. Judgment was rendered accordingly. Foreman appeals seeking an increase in damages. State Farm answered the appeal contending that Trahan was not liable and, in the alternative, if liability is established, the damage award is excessive.
The issues on appeal are:
(1) Whether Trahan was liable for the damages incurred by Foreman in the accident; and

*260 (2) Whether the jury erred in its award of damages.

LIABILITY
The jury answered interrogatories regarding liability of Trahan as follows:
"Do you find that David Trahan was negligent and this negligence was a cause of the accident?

 Answer Yes or No
 Answer: `Yes'
* * * * * *
"Do you find that Ronnie Foreman was negligent and this negligence was a cause of the accident?
 Answer Yes or No
 Answer: `No'"
Implicit in the jury's answers to the above interrogatories is the factual conclusion that Trahan did not comply with the law applying to motorists making a left turn at an intersection.
The law of this state requires that the driver of a vehicle intending to turn left within an intersection yield to oncoming vehicles which are so close as to constitute an immediate hazard. Our courts have consistently held that a motorist attempting a left turn is required to exercise a very high degree of care. Such a left-turning motorist, when involved in a collision, is burdened with the presumption of liability for the accident. The left-turning driver must prove that he is free from negligence to avoid liability. This burden of proof applies to the defendant whether or not the intersection is controlled by semaphore lights, including a left-turn signal. If the left-turn motorist is faced with a green arrow left-turn signal, defendant must prove that he was making such turn while the arrow was green or that he had pre-empted the intersection. Dunn v. Snyder, 388 So.2d 450 (La.App. 2nd Cir. 1980). With these principles in mind we examine the facts in the case at hand.
The record reflects that on the morning of January 19, 1978, Foreman was driving his 1973 Volvo north on Ryan Street, a four lane thoroughfare, that intersects Sale Road. At the same time, Trahan was proceeding south on Ryan Street, intending to turn left into Sale Road. This intersection is controlled by electric semaphore lights. Motorists approaching the intersection traveling on Ryan Street who desire to make a left turn are afforded a traffic light sequence which includes an illumined green arrow signaling that it is safe to make a left turn. When the left turn arrow is lighted, traffic approaching from the opposite direction faces a red light.
Foreman and his passenger testified that as he approached the intersection the light controlling their lane of traffic turned from red to green. This transpired when they were approximately 200 feet from the light. Foreman proceeded into the intersection and as he did so, Trahan made a left turn into Foreman's lane of travel. Foreman was unable to avoid striking the Trahan vehicle. Foreman's testimony was corroborated by a disinterested witness who was stopped at the light facing north with the intention of making a left turn on Sale Road. She stated that the light had turned green for Foreman before he arrived at the intersection. As Foreman proceeded into the intersection, Trahan turned left in front of Foreman causing the collision. The Foreman car was damaged on the left front and the Trahan car was damaged in the area of the right door.
Trahan and his two sisters, who were his passengers, testified that the left-turn arrow was green when Trahan was making his left turn. This means that the light would have been on red for Foreman when he came into the intersection.
The jury, in making its determination that Trahan was negligent and Foreman was free of negligence, must have rejected the testimony of Trahan and his passengers and accepted the testimony of Foreman, his passenger and the disinterested witness. We find no error in this determination by the jury.

"When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable *261 factual basis for the trial court's finding, on review the appellate court should not disturb the factual finding in the absence of manifest error. ..."
Canter v. Koehring Company, 283 So.2d 716, 724 (La.1973).

QUANTUM
The jury returned a verdict for damages by answering an interrogatory as follows:
"What were the damages suffered by Ronnie Foreman as a result of the accident of January 19, 1978?
 $ `11,600' "
The principal issue on appeal is whether the jury erred in its assessment of these damages. In making its quantum determination, the jury was faced with unusual facts and circumstances which greatly increased the usual complexities of determining damages. As will be discussed hereafter, we have concluded that the jury did not err in its determination of quantum.
The question of quantum is made more difficult than usual because Foreman was involved in three automobile accidents, each allegedly causing complaints of injuries and pain in the neck and shoulder areas. Foreman was involved in accidents occurring on the following dates:
August 28, 1977Foreman's vehicle was struck from the rear at the intersection of Ryan Street and Prien Lake Road in Lake Charles;
January 19, 1978the accident in question in this suit;
July 8, 1980Another car changed lanes striking Foreman's car at the left front.
Foreman filed two suits on August 16, 1978. The first suit arose out of Accident # 1 and the second suit arose out of Accident # 2. The suit arising out of Accident # 1 was settled. The suit at hand concerns Accident # 2 which occurred January 19, 1978.
In addition to the problem of multiple accidents, the solution of this suit is further complicated by the fact that the principal complaints following each accident were mainly centered around pain in Foreman's cervical and shoulder area. He also complained of low back pain after Accident # 3.
Foreman argues that following Accident # 2 and before Accident # 3, he incurred $10,704.52 as medical expenses. He contends that all these expenses are attributable to the injuries received in the second accident. As we shall show hereinafter, the medical testimony does not support Foreman's position that such expenses were incurred as a result of injuries received in Accident # 2. The evidence will show that it is more probable than not that a majority of such expenses arose from injuries received in Accident # 1.
Foreman kept a diary following the first accident. The notations in the diary were used at trial to refresh his memory. We feel that it is important to set forth Foreman's testimony concerning his physical problems following the first accident. On the cross examination Foreman testified as follows:
"Q. Mr. Foreman, you said you were getting back to normal just prior to the firstjust prior to the second accident, you felt you were getting back to normal? Is that correct?
"A. Yes, I felt like I was on the way.
"Q. Now if we go back, you first saw Dr. Drez
"A. Right.
"Q. In September, or August, early Augustlate August or early September?
"A. First of SeptemberI'm sure it would have been one of the two; right.
"Q. And I want you to look at yourI hand you your diary here.
Now, Mr. Foreman, on September 27th you note in your diary that you saw Dr. Drez, and that there was no sign of relief. Isn't that correct?
"A. On September 27, right. I wasI think I was quoting Dr. Drez. No direct sidebutYeah, that's what is written in here.

"Q. And then you complain of pain on the 23rd, showing sharp pain in your legs *262 and arms, and you note then that you must get a new doctor.

* * * * * *
"Q. I think it's OctoberWell, on October 30, you note that there are very sharp pains, soreness, stiffness, in your legs and arms, isn't that correct?
"A. Yes; that would be the 30th, right.
"Q. You saw Dr. Foster on November 11th, and at that time Dr. Foster indicated that he might want to do a myelogram on you?
"A. That's right.
"Q. And you were afraid to do the myelogram at that time?
"A. That's right.
"Q. Didn't want to have one done. Now on December 8th you said you were afraid of a myelogram, but you must get one done if the sharp pains continue; isn't that correct?
"A. Well, it doesn't say that.
"Q. It says afraid of myelogram; felt like must get one, dash, pain don't subside.
"A. Yeah.
* * * * * *
"Q. Onwell, let's just go a few days, Mr. Foreman. A few days on, in December ofDecember 9th, drove to Houston, very tired, leg, arm, neck, very tired, arm sharp pains, is your next day.
"A. Okay.
"Q. Just to skip a couple of days, on December 12th you had tight neck on the right side and back, is that correct?
"A. Yes.
"Q. On the 13th your legs and arms were burning?
"A. Yes.
"Q. On the 14th your neck and your arm hurt?
"A. Right.
"Q. We go just a little bit forward, on the 22nd you called Dr. Litel. You are having pains in your rear, or rear side, left rear side, back and neck severe pain. You called Dr. Litel for an appointment so you could see another doctor at that time?
"A. Right.
* * * * * *
"Q. December 25th you are having pain in your right arm and legs. The 26th, you are having sharp pulsating pains in your arm. January 3rd, you need a muscle relaxer. January 4th is when you go see Dr. Lange, and I presume that he gives you the treatment. January 10th, very sore neck. January 12th neck and arm, legs, sharp pains. January 15th, you are having sharp pains in leg, spasmodic sharp pains in back. January 16th your right arm, shoulder, right neck hurt. January 17th, sharp pains, no more muscle relaxers. You are out of muscle relaxers. January 18th, you go to see Dr. Lange again, and he gives you some treatment. January 19th, you have your automobile accident. Now you don't go see another doctor after that automobile accident, and you go to the hospital, until you go back to see Dr. Lange, I think sometimeyour next note that you see Dr. Lange on February 1st.
"A. Okay.
"Q. Is that correct?
"A. Yes.
"Q. So obviously you have been having difficulties right up until the day of the second accident, isn't that correct?
"A. Yes, that's correct. I think this would reflect that.
"Q. And during the time period of the second accident, from January 19th to your third accident, you indicated that over that period of time you got somewhat better?
"A. Yes."
We quote this portion of Foreman's testimony which shows continued pain in his neck, arms and legs up until Accident # 2 which occurred January 19, 1978. Also, it is important to note that Foreman admits that Dr. Foster recommended that a myelogram be performed as a result of injuries received in Accident # 1. The myelogram was refused at that time by Foreman but was later performed by Dr. Foster after Accident # 2.
*263 Foreman saw several physicians, an osteopath, and a physical therapist following the accidents.
Following Accident # 1, he first saw Dr. David Drez, an orthopedic surgeon. Dr. Drez examined Foreman on September 1, 1977. Foreman was complaining of pain in the neck and shoulders. Dr. Drez, after examination, concluded that Foreman had sustained a straining injury to the cervical musculature. He prescribed medication and recommended therapy to be administered by Dowell Fontenot. Dr. Drez saw Foreman on two other occasions; both times his complaints were about the same as those on the first examination. Further examinations were made and this physician each time felt that Foreman's problem was muscular in origin. Dr. Drez last saw Foreman on September 27, 1977.
Dr. William Foster, a neurosurgeon, saw Foreman on November 10, 1977. Foreman was complaining of pain in the lower cervical region, arms and legs. Dr. Foster stated that Foreman's past history showed that he had been "having neck pains of an unknown origin for approximately one year prior to this office visit." Foreman also related that he had not obtained any relief from the treatment of Dr. Drez or Dowell Fontenot, the therapist.
Dr. Foster performed a complete neurological examination and his diagnosis was as follows: "I felt that he had sustained a cervical straining injury with nerve root irritation." Dr. Foster prescribed medication and recommended a myelogram to ascertain the cause of the nerve root irritation. This was refused by Foreman.
Dr. Foster next saw Foreman on April 22, 1978 (after Accident # 2). The complaints of pain were basically the same as those made on the visit following Accident # 1. Dr. Foster's findings after Accident # 2 were substantially the same as his findings after Accident # 1.
The next visit by Foreman to Dr. Foster occurred on June 25, 1978. Foreman continued to complain of neck and arm pains. Foreman was admitted to the hospital for conservative treatment. After the complaints persisted, Foreman agreed that Dr. Foster could perform a myelogram. This was done and revealed a defect at the C-5-6 level. Initially, Dr. Foster felt that the defect could represent a degenerative disc. Foreman was released from the hospital and medication prescribed. Foreman was later hospitalized on July 20, 1978, for a treatment of headaches which were caused by a procedure connected with the myelogram. This problem was alleviated. Foreman was released from the hospital but was re-admitted for a second myelogram in order for Dr. Foster to ascertain the nature of the defect. This second myelogram was performed on October 17, 1979. This myelogram revealed that the defect which had previously been present had disappeared. Dr. Foster explained the disappearance of the defect by pointing out that the defect had been caused by a "small hematoma or edema" which had cleared up.
On October 23, 1979, Dr. Foster called in Dr. George Schneider, an orthopedic surgeon, to assume the treatment of Foreman. Dr. Foster didn't see Foreman again until January 27, 1981, after the third accident.
Dr. Schneider saw Foreman on November 1, 1979, March 27, 1980, April 17, 1980 and July 10, 1980 (after the third accident which had occurred July 8, 1980). Prior to the July 10, 1980 visit, Foreman's complaints were generally the same as those given to Dr. Foster. Foreman stated that his condition was improving and his pain was only intermittent until the occurrence of the third accident. This latter accident resulted in an increase in complaints and, for the first time, Dr. Schneider found objective signs of injury. This physician found spasms and atrophy developed in the right leg indicating a back problem. He felt that the third accident severely aggravated the existing condition of Foreman.
Dr. Foster again saw Foreman in January 1981 (after Accident # 3). He found spasm in the neck area and atrophy in the right leg. He stated that these conditions were the result of Accident # 3. He based this conclusion on a review of his prior examination and x-rays taken from the myelogram procedure.
*264 Dr. Foster testified that even though he had been seeing Foreman after Accidents # 1 and # 2, it would be medically impossible for him to differentiate between which accident caused what injury. The only opinion that Dr. Foster could give in that regard was that Accident # 2 could have aggravated Foreman's condition to some extent, thereby requiring some additional time for recovery. Dr. Foster stated that he based this conclusion upon the history and subjective complaints of pain as related to him by Foreman.
Dr. Gerald Litel, a neurosurgeon, was consulted by Foreman on three occasions during 1978 (after Accident # 2); February 3rd, March 2nd and March 16th. Dr. Litel testified that he diagnosed a cervical strain. He found no disc injury.
Foreman went to see Dr. Gerald Lange, a general practitioner in Beaumont, Texas, on January 3, 1979, after Accident # 1 but before Accident # 2. This physician diagnosed a ruptured disc at the C-5-6 area. He gave Foreman a shot for pain. This treatment was repeated on a weekly or bi-weekly basis until May 22, 1979. He stated that Foreman's condition would require surgery in the cervical area. This diagnosis is not supported by any of the other medical evidence.
Foreman was seen by Dr. Masak Wakabayashi, a radiologist, on March 9, 1981, for examination to determine if there existed any disc injury. This physician performed a thermogram of the cervical and lumbar region. He was of the opinion that Foreman had no disc injury.
The jury was not asked to make separate awards for special and general damages. The total award of $11,600.00 was returned. Under these circumstances it will be necessary for us to make findings first as to what special damages were attributable to Accident # 2 and, secondly, to consider what general damages emanated from this accident.
As we consider the testimony of Foreman and the several physicians, especially Dr. Foster, the principal physician, we conclude that Accident # 1 initiated the cervical region condition which continued to exist following Accident # 2. A nerve root irritation was diagnosed by Dr. Foster after Accident # 1. This caused the physician to recommend a myelogram. This myelogram was refused by Foreman at that time but was later performed after Accident # 2. The defect found on this occasion was later determined to be caused by a single bruise (edema), which disappeared as shown by the second myelogram. This sequence of events convinces us that it is more probable than not that the initial nerve root irritation in the cervical region emanated from Accident # 1.
We do find, however, that some injury, although not appreciable, resulted from Accident # 2. We find that Accident # 2 imposed some additional trauma upon an existing condition which lengthened the time of recovery to some extent.
Foreman testified that before Accident # 2 he was improving and his pain was only intermittent. We note that during the entire time, up until the time of trial, Foreman performed his regular duties as a photographer for McNeese State University. Further, Foreman stated that following Accident # 1, he did not participate in duck hunting during the 1977-1978 season. He did, however, participate by hunting regularly in the 1978-1979 and 1979-1980 seasons.
As we examine the evidence in its totality, we find that, of the medical expenses incurred[1] and listed below (with two *265 exceptions), twenty percent of these expenses are attributable to injuries received in Accident # 2. The two exceptions are the bill of Dr. Bono for $336.00 and St. Patrick's Hospital in the amount of $195.00. These two items are attributable in full to Accident # 2. Dr. Bono repaired two teeth injured in Accident # 2 and the St. Patrick's Hospital Bill covered an emergency room use as a result of Accident # 2. The total amount of medical expenses attributable to Accident # 2 is $2,565.70.
Foreman contends that he also proved the following special damages were attributable to Accident # 2 and which should be allowed:

Depreciation of value of
 Foreman's automobile $2,000.00
Car Rental 1,770.00
Loss of sick leave and
 compensatory time 4,461.90

As to the loss of value of the automobile, Foreman called as a witness, Richard Boese. Boese was qualified as an expert in the body repair business. He had purchased and sold some cars but had never been in the business of buying or selling cars, nor did he hold himself out as an expert in the appraisal of the value of automobiles. He expressed an opinion that a "ball park figure" for depreciation of the value of Foreman's car would be $2,000.00 to $2,500.00. It is not clear from his testimony whether this depreciation took place as a result of Accident # 1 or Accident # 2, or both. We do not consider this item as having been proven by preponderance of the evidence.
The car rental of $1,770.00 is supported by the bills in the record. These bills show that Foreman drove the rental equipment for a total of 3,344 miles in approximately two months following Accident # 2.[2] This amount is recoverable by Foreman.
As to the sick leave and loss of compensatory time, this loss was principally due to time spent going to the various physicians. We note that Foreman continued to perform his duties as a photographer for McNeese State University during the entire time except when he was hospitalized for the myelogram in 1978. For the reasons given for alloting twenty percent of the medical expenses to Accident # 2, we also allot twenty percent of sick leave and loss of compensatory time ($892.30) to Accident # 2.
Finally, Foreman contends that the jury award should be increased to include a greater award for general damages. We do *266 not know how the jury allocated the various medical, other special and general damages. After considering the amount of special damages attributable to Accident # 2, we arrive at a conclusion that the jury was not clearly wrong in its total award of $11,600.00 including general damages. When we deduct the specials from such total award, the remainder is $6,372.00. After a careful perusal of the record we conclude that an award of this sum for general damages due to injuries received in Accident # 2 is neither excessive nor inadequate. Thus, the total jury award of $11,600.00 was within the discretion of the jury and will not be disturbed upon appeal.
For the reasons assigned, the judgment of the trial court is affirmed. Plaintiff-appellant is to pay the costs of this appeal.
AFFIRMED.
NOTES
[1] of
Visits
 15 Dr. Foster $ 1,305.00 (Tr. 282, 283)
 Diagnostic Radiology 258.49 (Tr. 290)
 5 Lake Charles Memorial Hospital 3,617.63 (Tr. 290)
 1 St. Patrick's Hospital 195.00 (Tr. 287)
 12 Lake Charles Physical Therapy 196.00 (Tr. 288, 289,
 148, 149)
 1 Methodist Hospital, Houston, Tx 75.00 (Tr. 290)
 1 Dr. Barsela, Houston, Tx 140.00 (Tr. 290)
 Dr. Cook 124.00 (Tr. 290)
 Dr. Karam 25.00 (Tr. 290)
 49 Dr. Lange, Beaumont, Tx 1,925.00 (Tr. 290)
 7 Dr. George Schneider 160.00 (Tr. 152)
 2 Dr. Gerald Litel 50.00 (Tr. 290)
 1 Dr. Barkemeyer 140.00 (Tr. 290)
 1 Dr. Stubbefield 25.00 (Tr. 150)
 5 Dr. Bono 336.00 (Tr. 290)
 Drs. Kent and McCauley 50.00 (Tr. 290)
 2 St. Patrick's Radiology 50.00 (Tr. 290)
 Dr. K. Griffith 13.00 (Tr. 290)
 66 Dr. Carl Warden 1,850.00 (Tr. 449)
 Barger's Drugs 169.00 (Tr. 290)
 ___ __________
 168 TOTAL $10,704.52

[2] The time of repairs was protracted as the parts for repairs had to be ordered from Sweden.