454 So.2d 587 (1984)
Patricia A. FAY, Appellant,
v.
Edgar MINCEY, an Individual, and Sentry Insurance Company, a Corporation, Appellees.
No. 83-683.
District Court of Appeal of Florida, Second District.
June 27, 1984.
Rehearing Denied July 26, 1984.
*588 Paul Antinori, Jr. of Antinori & Thury, P.A., and Rudy G. LaRussa, Tampa, for appellant.
Michael S. Rywant of Prugh & Rywant, Tampa, for appellees.
RYDER, Judge.
Patricia Fay, plaintiff below in a negligence action brought pursuant to section 627.737(2), Florida Statutes (1981),[1] appeals the final judgment entered in favor of appellees, Mincey and his insurance company, which confirmed the jury's findings that *589 Mincey had been negligent but Fay had not sustained permanent injuries. More specifically, she challenges the trial court's decisions (1) to preclude her chiropractic physician from testifying as to liquid crystal thermography (LCT)[2] and his use of that *590 diagnostic procedure in determining the permanency of her injuries and (2) to exclude from evidence the thermographic photographs of Fay taken by him. We reverse because the trial court abused its discretion with respect to these rulings and the exclusions were not harmless error.
Fay filed a complaint against appellees Mincey and Sentry Insurance Company (Sentry) to recover damages recoverable under section 627.737(2) for personal injuries she allegedly suffered in an automobile collision which occurred on May 14, 1981. The amended complaint alleged the accident was caused by Mincey's negligence in maintaining, operating, or controlling the vehicle he was driving and that she received "serious and permanent injuries to her head, neck, back, body and extremities ... all of which injuries and conditions resulting therefrom are either permanent or continuing in their nature" as a direct and proximate result of Mincey's negligence. It was further stated that Mincey was insured under a liability insurance policy issued by Sentry. Appellees filed an answer denying Mincey's negligence and asserted Fay's comparative negligence as one defense and the "no-fault" tort liability exemption provision of section 627.737 as a second defense.
The following is a chronicle of Fay's encounters with the health-care system subsequent to the accident:
After the auto accident on May 14, 1981, Fay was taken to the emergency room of St. Joseph's Hospital in Tampa, according to the emergency room report. Both the ambulance driver's report and the hospital emergency room report indicated Fay had complained of a lower back pain after the accident. A physical examination was conducted and then x-rays of Fay's back were taken. The physicians' reports indicated that no physical trauma injuries were observed and that no abnormalities were present on the x-rays. Fay did not consult further health care practitioners for her lower back pain until August 27, 1981, when she saw a licensed Florida chiropractic physician, Dr. Jeffrey Poritz. After conducting a chiropractic orthopedic examination of Fay, including the taking of x-rays, Dr. Poritz referred her to Norman Rosenthal, M.D., a licensed Florida physician specializing in diagnostic radiology. On November 12, 1981, Dr. Rosenthal made an LCT study of Fay's lumbar spine area and cervical spine area. Thereafter, Fay remained under the care of Dr. Poritz until he discharged her from formal treatment on February 10, 1982. Fay also saw Donald Vesley, M.D., a psychiatrist, and he treated her until July 19, 1982. On October 26, 1982, Frank Kriz, M.D., an orthopedic surgeon, performed an independent medical examination of Fay on appellees' behalf. Kriz gave Fay a physical examination and took x-rays.
Prior to trial, Dr. Vesley examined Fay at the request of her counsel in preparation for trial. Dr. Poritz re-examined Fay on February 9, 1983, also at the request of her trial counsel for the purpose of obtaining a more current opinion and diagnosis of Fay's condition. At that examination, Dr. Poritz, in addition to repeating the diagnostic tests performed at the initial visit, performed his own LCT study of Fay with his own equipment.[3]
At the jury trial, Fay offered Dr. Rosenthal as an expert witness in the areas of radiology and thermography. The trial court accepted Dr. Rosenthal as an expert in radiology and then allowed Fay's counsel to inquire as to his qualifications in the area of thermography. Dr. Rosenthal described LCT and explained how the procedure enables experts to determine the presence of soft tissue injuries in the area of a patient's back and extremities.[4] Dr. Rosenthal *591 opined that if the procedure is done properly, LCT can objectively indicate a soft tissue injury "as much as 95% of the time."
With respect to his qualifications in this area, Dr. Rosenthal stated he received formal training in thermography courses and lectures conducted at meetings of the American Thermographic Society, the recognized professional association in this area. He indicated he was a member of the Society and that he had read current literature and scientific treatises dealing with thermography. He added he had employed LCT as a diagnostic tool on at least 250 occasions. He stated the procedure was being used in between 70 and 100 hospital and "pain centers" throughout the country and was also being taught in several United States medical residency programs.
As for trustworthiness of this diagnostic device and its test results, Dr. Rosenthal testified that LCT was scientifically reliable and more accurate in many cases than the use of a myelogram to diagnose the presence of spinal root or cord syndrome disease in soft tissue injury cases.[5] He stated he had conducted statistical studies pertaining to LCT's reliability in connection with his patient's complaints and personally found the procedure to be about 95% accurate for detecting soft tissue injuries. He mentioned he had read several statistical studies undertaken to demonstrate the reliability of LCT to detect such injuries, and he indicated these published studies both recognize LCT and generally substantiate the findings he had personally made. Dr. Rosenthal also testified a person can be taught to properly perform the LCT procedure in twenty minutes. He admitted there are times when the results of the process can be inaccurate due to procedural and control deficiencies.
During their voir dire, appellees' counsel did not dispute the validity of Dr. Rosenthal's statements and did not present any evidence to counter his testimony. Subsequently, over appellees' objections that LCT had not obtained scientific reliability and that Dr. Rosenthal was not qualified to testify as to thermography and his use of that procedure on Fay, the trial court permitted Dr. Rosenthal to testify as to thermography in general and as to the results of the thermographic study he conducted on Fay. Additionally, the thermograms were admitted into evidence.
Dr. Rosenthal stated that on November 12, 1981, he performed an LCT study on Fay utilizing the established procedures, including considering surrounding room temperature and other control factors. He opined that the thermographic photographs of Fay's cervical and lumbar spine areas revealed the presence of soft tissue injuries as of November 12, 1981.
Appellant then offered Dr. Poritz as an expert in chiropractic medicine and thermography. He stated he began a private chiropractic practice in Florida after receiving his degree in chiropractic medicine from the National College of Chiropractic and spending approximately three years in internship programs working with various medical disciplines, including orthopedics and neurology. After practicing general chiropractic medicine for approximately five years, Dr. Poritz undertook a post-graduate program in the specialty of chiropractic orthopedics which involves the advanced study of bone and joint disorders from a chiropractor's viewpoint. He completed the program over a five-year period while he practiced chiropractic medicine. The trial court accepted Dr. Poritz as an expert in chiropractics. He then testified that the results of his physical examinations of Fay indicated her as having a lower back sprain because of a tearing of muscle tissues and ligaments due to trauma to the lower spine area. The x-rays taken by him were received into evidence *592 without objection, and he testified that those x-rays revealed an injury to Fay's lower spine. Based upon his physical examinations and x-rays, he opined that it was within a reasonable medical probability that Fay had sustained a permanent injury of her lower spine area due to the automobile accident, and, as a result, she would suffer a 10% permanent disability.
When Fay proffered Dr. Poritz as an expert witness in thermography, specifically LCT, appellees objected on the basis of his qualifications. The trial court then allowed an inquiry into those qualifications. Dr. Poritz stated thermography was being currently taught at the National College of Chiropractic and was being widely used by chiropractors across the country on a routine basis. With respect to his expertise in LCT, Dr. Poritz explained he received formal training in two courses he had taken in the past two years, one sponsored by the American Thermographic Society and the other conducted by the Albert Einstein Medical School four weeks prior to his utilization of LCT on Fay. As a result of his participation in the latter program, he received a certificate of successful completion of the courses and also received fourteen continuing education credits which could be applied to fulfilling his state license renewal requirements.[6] Dr. Poritz added thermography was utilized in many of the post-graduate orthopedic courses he had taken during the past five years, he had read extensively the scientific literature relating to LCT, and had studied with Dr. Rosenthal for a long period of time prior to undertaking to perform the procedure himself. Dr. Poritz mentioned he initiated a program of conducting thermograms with his own equipment in June of 1982, and he employed the same procedures and controls Dr. Rosenthal had used. He testified he had conducted between 100 and 150 thermograms for diagnostic purposes. He stated he had been qualified and testified as an expert in liquid crystal thermography in a prior negligence case tried in Hillsborough County.
Appellees did not present any testimony or evidence to refute Fay's assertions that chiropractors could be qualified to use LCT and that Dr. Poritz specifically was a qualified expert in LCT. Moreover, appellees did not challenge the reliability of his LCT study of Fay. They merely argued that the training, both formal and informal, which Dr. Poritz had received was inadequate to qualify him to testify with respect to his diagnostic use of the LCT on his patients. The trial court sustained appellees' objection and prohibited Dr. Poritz from testifying as an expert in LCT and as to the results of his use of the procedure on Fay. The court also refused to allow the introduction of the thermographic photographs of Fay taken by Dr. Poritz. With the court's permission, however, Fay was permitted to proffer Dr. Poritz's testimony and the exhibits out of the jury's presence. He stated his analysis of the thermograms confirmed his independent diagnosis that Fay had suffered a permanent lower back sprain. Fay rested after Dr. Vesley, the psychiatrist, testified he felt Fay was not malingering with respect to her physical complaints.
Appellees then presented Dr. Kriz who testified that his examination of Fay on October 26, 1982, which included a physical examination and x-rays, enabled him to conclude that Fay had suffered no permanent injury or permanent disability as a result of the automobile accident. He mentioned *593 he did not use thermography but was aware that the temperature readings could be "super sensitive to a tenth of a degree." He suggested, however, that the results of a particular thermographic study could be inaccurate because of intentional or negligent mishandling of the administration of the procedure.
Appellees next presented the deposition testimony of Dr. Giuseppe Belluccia, an internist, who testified that he first saw Fay at St. Joseph's Hospital when she was admitted to the emergency room. He testified when Fay was admitted she complained only of abdominal pain and related symptoms, and his diagnosis found some very moderate dehydration and he treated her accordingly. He stated she had two follow-up visits again concerning abdominal pains and she never called his attention to any complaint she had with respect to her back or legs. He did not see her after her second visit on June 9, 1981. Appellees then rested.
A special verdict form was submitted to the jury, and subsequently the jury found Mincey's negligence was the legal cause of damages to Fay but that she had not sustained a permanent injury within a reasonable degree of medical probability. Thereafter, Fay filed a motion for new trial, alleging the trial court committed error in prohibiting Dr. Poritz from testifying as to his findings and conclusions with regard to his thermographic examination of Fay and in prohibiting the thermographic photographs from being introduced into evidence. Later, the trial court entered the final judgment conforming to the jury's verdict and also entered an order denying the motion for new trial. It is from these orders that Fay appeals.
The issues in this appeal are clear. The ultimate questions to be resolved are whether the trial court committed reversible error in prohibiting Dr. Poritz from testifying as to LCT and his use of the procedure to determine that Fay had suffered permanent injuries within a reasonable degree of medical certainty as a result of the automobile collision and in excluding from evidence the thermographic photographs supporting his opinion.
As an initial point, we find no error with the trial court's ruling that LCT is used by qualified health-care professionals to reveal the presence of soft tissue injuries such as lower back sprains and strains, is a sufficiently reliable and acceptable "scientific-medical"[7] diagnostic procedure, and, therefore, testimony and evidence relating to a particular thermographic study is admissible under appropriate circumstances. Coppolino v. State, 223 So.2d 68 (Fla.2d DCA 1968), appeal dismissed, 234 So.2d 120 (Fla. 1969), cert. denied, 399 U.S. 927, 90 S.Ct. 2242, 26 L.Ed.2d 794 (1970). In Florida, the admissibility of evidence relating to a relatively new scientific-medical test, experiment or procedure lies largely within the discretion of the trial court. Rodriguez v. State, 327 So.2d 903 (Fla. 3d DCA 1976). However, the trial court should exclude evidence acquired through a new test or procedure if the results are "so unreliable and scientifically unacceptable" in the appropriate expert community, Jent v. State, 408 So.2d 1024, 1029 (Fla. 1982)  a seemingly liberal standard  or, stated a different way, the trial court "should admit evidence of scientific tests and experiments only if the reliability of the results are widely recognized and accepted among scientists." Stevens v. State, 419 So.2d 1058, 1063 (Fla. 1982)  a seemingly more narrow standard. (Emphasis supplied).
The Florida decisions cited herein seem to suggest somewhat different standards for determining the admissibility of a particular new test or procedure. See Brown v. State, 426 So.2d 76, 85-90 (Fla. 1st DCA 1983).[8] Whatever the exact standard *594 to be applied, it is clear that before the new scientific-medical procedure and its results are admissible, a trial court must determine that the new test being presented has some reasonable degree of recognition and acceptability among the spectrum of scientific and/or medical experts (not necessarily limited to Ph.D.'s and M.D.'s) who study, diagnose, test, and otherwise deal with the particular disease or injury which is sought to be examined and diagnosed by the proffered test.
In the case sub judice, Dr. Rosenthal's undisputed testimony as to the acceptability and reliability of LCT for diagnosing the presence of soft tissue injuries supports the trial court's decision to acknowledge the validity of LCT for purposes of aiding the jury in its deliberations.[9] § 90.702, Fla. Stat. (1981). Moreover, we note, consistent with Dr. Rosenthal's testimony, that recent scientific studies evaluating the reliability of LCT to diagnose the type of injury allegedly suffered by Fay also support the trial court's ruling. See generally Rubal, Traycoff & Ewing, Liquid Crystal Thermography, Physical Therapy, 62:1593 (Nov. 1982); Pochaczevsky, Wexler, Meyers, Epstein & Marc, Liquid Crystal Thermography of the Spine and Extremities, Journal of Neurosurgery, 56:386 (Mar. 1982). Although there are no reported Florida decisions directly on point, the Louisiana appellate courts have consistently approved the admission of thermographic evidence in personal injury and workmen's compensation cases to prove the existence of nerve root injuries as well as soft tissue muscle injuries. Boyce v. New Orleans Public Service, Inc., 442 So.2d 808 (La. App. 1983); Foreman v. State Farm Mutual Automobile Insurance, 416 So.2d 258 (La. App. 1982); Deshotel v. Avondale Shipyards, Inc., 413 So.2d 208 (La. App. 1982); Blanchard v. A-1 Bit and Tool Co., Inc., 406 So.2d 773 (La. App. 1981). Also, see generally D. Archer and J. Zinn, Thermograms: Persuasive Tools in Soft Tissue Injury Cases, 19 Trial 68 (Feb. 1983);[10] JAMA 247:3296 (June 1982);[11] D. Meyer and P. Meyers, Would You Like to Know What Pain Looks Like?, 20 La. Bar J. 77 (Sept. 1980).
Although we hold that LCT testimony can be admitted into evidence, we remind all that counsel can, on cross-examination and in the presentation of one's own case, raise any recognized deficiencies in LCT as a diagnostic tool for objectively determining the presence of injury to soft tissue and challenge the credibility of the particular thermographic study being offered into evidence. The credibility of expert witnesses and the weight of their opinion testimony are for the jury to determine. See generally 1 Gard, Florida Evidence § 12:28, p. 469 (2d ed. 1980).
We must now address the propriety of the trial court's rulings regarding Dr. Poritz. Was Dr. Poritz qualified to testify as to the results of his thermographic examination of Fay and were the thermograms taken by him admissible? The Florida Evidence Code provision dealing with admissibility of expert testimony, section 90.702, Florida Statutes (1981), provides:
Testimony by experts.  If scientific, technical, or other specialized knowledge will assist the trier of fact in understanding the evidence or in determining a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify about it in the form of an opinion; however, the opinion is admissible only if it can be *595 applied to evidence at trial. (Emphasis added).
In Horowitz v. American Motorist Insurance Co., 343 So.2d 1305 (Fla. 2d DCA 1977), this court held a licensed and qualified chiropractor could give expert testimony as to whether a person suffered permanent injuries as defined by the no-fault insurance law if the diagnosis and treatment of those injuries were "within the ambit" of the chiropractic discipline. See generally Annot., 52 A.L.R.2d 1380 (1955); J. Zele, Chiropractors as Expert Medical Witnesses, 20 Clev.St.L.Rev. 53 (1971). In the case below, the trial court, after accepting him as an expert in chiropractic medicine, properly allowed Dr. Poritz to testify on the basis of the x-rays and his chiropractic examinations that Fay had suffered a permanent injury to her lower back as a result of the automobile accident.[12] The injuries testified to by Dr. Poritz were clearly treatable within the scope of chiropractic medicine. § 460.403(3)(a), Fla. Stat. (1981).[13]Horowitz at 1308. However, since Horowitz does not resolve the ultimate issues presented by this appeal, we find it necessary to re-examine section 90.702 and the general law relating to the admissibility of expert testimony.
It is well-established that an expert does not need a special degree or certificate in order to be qualified as an expert witness in a specialized area, such as thermography, but can be qualified by his "experience, skill and independent study of a particular field." Salas v. State, 246 So.2d 621 (Fla. 3d DCA 1971); see generally 1 Gard, § 12:08, p. 429. Additionally, neither the legislature nor the State Board of Chiropractic place limitations on the types of diagnostic tools which a chiropractic physician may employ in his practice. § 460.403(3)(a). Finally, we note the trend is to liberally construe section 90.702. Mannino v. International Mfg. Co., 650 F.2d 846 (6th Cir.1981) (construing similar federal provisions). Accordingly, assuming LCT is an appropriate subject for a jury's consideration in personal injury cases brought under section 627.737, we hold a licensed chiropractor is not precluded from being qualified to testify as to LCT and giving an opinion with respect to a particular thermographic study done by him if the trial court determines the proffered expert possesses a sufficient knowledge and understanding of this method of diagnosis due to his familiarity with the scientific literature, training, and actual utilization of the procedure.
Examining the facts of this case, we believe the uncontradicted testimony of Dr. Poritz with respect to his qualifications as an expert on LCT and its application to his patients' cases provided a sufficient basis for a ruling by the court that he could testify as an expert. The facts supporting Dr. Poritz's qualifications in thermography are not significantly different than those supporting Dr. Rosenthal's. Therefore, we hold the trial court erred in excluding Dr. Poritz's testimony in this regard. We further hold the trial court also erred in excluding *596 the thermograms upon which Dr. Poritz relied in arriving at his opinion as long as there was a sufficient predicate proffered to support their reliability.
Finally, we hold the exclusions were reversible error and not harmless error because Fay could not recover unless she proved she had suffered a permanent injury, Dr. Poritz's proffered opinion would be very recent evidence which would support this asserted fact, and his testimony and opinion would counteract Dr. Kriz's also recently obtained evidence that Fay was not suffering compensable, permanent injuries under the no-fault law. In short, the exclusions were not harmless because medical testimony is necessary in establishing a permanent injury under section 627.737(2). Avis Rent-A-Car System, Inc. v. Stuart, 301 So.2d 29 (Fla. 2d DCA 1974). We therefore REVERSE the jury's verdict, order a new trial, and REMAND the cause for proceedings consistent with this opinion.
BOARDMAN, A.C.J., and CAMPBELL, J., concur.
NOTES
[1] Section 627.737(2) provides:

(2) In any action of tort brought against the owner, registrant, operator, or occupant of a motor vehicle with respect to which security has been provided as required by ss. 627.730-627.741, or against any person or organization legally responsible for his acts or omissions, a plaintiff may recover damages in tort for pain, suffering, mental anguish, and inconvenience because of bodily injury, sickness, or disease arising out of the ownership, maintenance, operation, or use of such motor vehicle only in the event that the injury or disease consists in whole or in part of:
(a) Significant and permanent loss of an important bodily function.
(b) Permanent injury within a reasonable degree of medical probability, other than scarring or disfigurement.
(c) Significant and permanent scarring or disfigurement.
(d) Death.
[2] Webster's New Collegiate Dictionary (1981 ed.) defines thermography as "a technique for detecting and measuring variations in the heat emitted by various regions of the body and transforming them into visible signals that can be recorded photographically (as for diagnosing abnormal or diseased underlying conditions)." The resulting photograph or record is called a thermogram. Id. Two legal commentators have succinctly explained the principle behind thermography:

The main physiological principle upon which thermography is based is that the infrared energy radiating from the skin surface will vary, depending upon the amount of vascular supply in and below the skin surface. Body heat produced by our metabolic processes is distributed throughout the body by the vascular and lymphatic systems to the overlying skin, for ultimate loss by radiation and convection.
When the vascular supply to an area of the body increases, as when blood vessels dilate and allow an increased flow of blood in and below that area, there is a quantitative increase in the overlying skin temperature. It is the variations of the skin temperature that register on the thermograms.
S. Archer and J. Zinn, Thermograms: Persuasive Tools in Soft Tissue Injury Cases, 19 Trial 68-69 (Feb. 1983).
One group of medical commentators has described the instruments used and the procedures to be followed in conducting an LCT examination. See Pochaczevsky, Wexler, Meyers, Epstein & Marc, Liquid Crystal Thermography of the Spine and Extremities: Its Value in the Diagnosis of Spinal Root Syndromes, J. Neurosurg. 56:386-395 (Mar. 1982). They explain: the apparatus used to obtain the temperatures of the various parts of the body which are to be diagnosed consists of a hermetically sealed box (air-pillow box), one side of which has a transparent plastic wall and the other side composed of a rubber-like flexible sheath embedded with heat-sensitive liquid crystals (a special compound of cholesterol derivatives). The air-pillow box can be inflated by an air pump so that it will conform to the contour of those parts of the body sought to be examined. Six or more air-pillow boxes are available which are progressively numbered 26 to 35 in order to correspond with the median Celsius temperature ranges of their incorporated liquid crystal sheaths.
The examination should be performed in an air conditioned, draft-free room, and the skin temperature of the region of the body to be studied is stabilized by sponging the body with water for approximately ten minutes. After other precautions to insure accuracy have been taken, the air-pillow box with the widest display for the patient's skin temperature is selected. Liquid crystals have accurate reliable color responses to specific temperature changes. The lowest temperature is displayed as a dark brown color and changes with progressive temperature elevation to tan, reddish-brown, yellow, green, light blue and dark blue, the highest temperature. A 30° C box is initially selected. If brown colors dominate, the skin temperature is too cold for that particular box, and then a 28° C box is selected. If blue colors dominate, the skin temperature is too warm and a 30° C box is used. Once the appropriate box is selected, it is inflated and then firmly pressed against the designated part of the patient's body. A colored image almost immediately appears on the liquid crystal sheath. The air-pillow box is then lifted slightly from the skin surface to eliminate distortion and glare, and the image produced on the sheath is immediately photographed using an instant camera with an electronic flash system and a cross-polarized filter.
The next step in arriving at a diagnosis necessarily involves interpreting the photographs. A normal thermogram of the extremities shows symmetrical heat emission and a normal thermogram of the spine is characterized by a central zone of decreased heat emanation in the region of the spinal processes from the cervical spine down to the lower lumbosacral spine. A positive or abnormal thermogram will show evidence of a symmetrically increased heat production at myotomes (muscle segments) in the central zone or decreased heat production lateral to the midline along the cervical, thoracic, and upper lumbar spine. The abnormalities displayed on the color thermograms objectively indicate the presence of some type of injury or lesion. See also Rubal, Traycoff & Ewing, Liquid Crystal Thermography: A New Tool for Evaluating Low Back Pain, Physical Therapy, 62:1593 (Nov. 1982).
As a final note, we mention that prior to the use of the air-pillow box, the affected body surface which was to be diagnosed had to be blackened with a special type of water-based spray paint, the liquid crystals were then applied with an aerosol applicator, and after waiting approximately fifteen to twenty minutes, pictures of the treated surface were taken. Physical Therapy, 62:1593-1594.
The conventional form of thermography, which is more costly and cumbersome, involves utilizing infrared scanning techniques to diagnose breast tumors, R. Lawson, Ann.N.Y.Acad. Sci., 121:31-33 (Oct. 1964); R. Pochaczevsky, The Value of Liquid Crystal Thermography in the Diagnosis of Spinal Root Compression Syndromes, Orthop. Clinic N. Am., 14:271-188 (Jan. 1983); varicoceles or soft tumors located in the scrotal area, JAMA, 247:3296, 3301; lumbar disc disease, Albert, Glickman & Kalish, Thermography in Orthopedics, Ann.N.Y.Acad.Sci., 121:157-170 (Oct. 1964); and spinal root compression syndrome, Pochaczevsky at 14:283.
[3] At the time of this examination, Dr. Rosenthal had moved his medical practice from Hillsborough County.
[4] Dr. Rosenthal's testimony with regard to these matters is consistent with the discussion of LCT set out in note 2.
[5] According to Dr. Rosenthal, a myelogram is a widely accepted diagnostic procedure that involves taking x-rays of a spinal cord that has been injected with a contrast agent in order to detect abnormal structures such as tumors that are impending upon the neurocanal and spinal cord.
[6] With respect to license renewals, section 460.408, Florida Statutes (1981), provides, inter alia:

(1) No license renewal shall be issued by the department until the licensee submits proof satisfactory to the board that during the 2 years prior to his application for renewal he has participated in not more than 15 hours per year of continuing chiropractic education, as determined by the board, in courses approved by the board.
(2) The board shall approve only those courses that build upon the basic courses required for the practice of chiropractic.
(3) The board may take exception from the requirements of this section in emergency or hardship cases.
(4) The board may adopt rules within the requirements of this section that are necessary for its implementation.
See also rule 21D-13.04, Fla. Admin. Code.
[7] Our usage of the word "medical" is not intended to describe those actions or qualities that are only associated with M.D.'s. A particular diagnostic test may be used by more than one health-related profession.
[8] In Brown, Chief Judge Ervin describes what he believes to be the differing standards and then proposes a standard that essentially focuses on the relevancy of the proposed evidence. 426 So.2d at 85-90.
[9] We note that the trial court's decision to admit the thermograms of Fay taken by Dr. Rosenthal was also proper.
[10] Archer and Zinn note without citation that Florida, New York, and Wisconsin trial courts have also admitted thermograms into evidence. 19 Trial at 71.
[11] This particular article notes without citation that Illinois, New York, California, and Wisconsin "now accept thermographic evidence as objective proof or disproof of pain in workmen's compensation or personal injury cases." JAMA 247:3296.
[12] We point out that chiropractic physical examinations and the taking of x-rays are expressly set forth under Florida law as appropriate methods for diagnosing lower back injuries. § 460.403(3)(b), Fla. Stat. (1981). See generally Annot., 16 A.L.R. 458 (1982). This subsection provides:

(b) Any chiropractic physician who has complied with the provisions of this chapter may examine, analyze, and diagnose the human living body and its diseases by the use of any physical, chemical, electrical, or thermal method; use the X ray for diagnosing; and use any other general method of examination for diagnosis and analysis taught in any school of chiropractic recognized and approved by the Board of Chiropractic.
[13] This subsection provides:

(3)(a) "Practice of chiropractic" means a noncombative principle and practice consisting of the science of the adjustment, manipulation, and treatment of the human body in which vertebral subluxations and other malpositioned articulations and structures that are interfering with the normal generation, transmission, and expression of nerve impulse between the brain, organs, and tissue cells of the body, thereby causing disease, are adjusted, manipulated, or treated, thus restoring the normal flow of nerve impulse which produces normal function and consequent health.