Kenneth M. HUNTER & Terri L. Hunter, his wife, Plaintiffs,

v.

UNITED STATES of America & Eugene L. Lasek, Defendants.

No. 88–1031–CIV–ORL–18.

United States District Court, M.D. Florida, Orlando Division.

March 15, 1990.

Robert J. Telfer, Jr., Cianfrogna, Telfer & Reda, Pros. Atty., Titusville, Fla., for plaintiffs.

Kendell W. Wherry, Asst. U.S. Atty., Orlando, Fla., Major Michael Frederick, HO USAF/JACC, Washington, D.C., for defendants.

## ORDER

G. KENDALL SHARP, District Judge.

This action was brought under the Federal Tort Claims Act and was tried without a jury. The court enters its Order pursuant to Federal Rule of Civil Procedure 52(a).

## I.  FINDINGS OF FACT

### A.  Claims and Defenses

Kenneth M. Hunter brought this lawsuit to recover damages for injuries he claims were proximately caused by an automobile collision. Mr. Hunter seeks past and future medical, hospital, and nursing expenses, lost wages, and lost future earnings. Mr. Hunter also wants noneconomic damages for the pain and suffering he has experienced especially with respect to his divorce from Terri L. Hunter, which he blames on the accident. Mr. Hunter requests $250,000.00.[1] Terri L. Hunter also alleges that the accident and injuries led to the dissolution of their marriage, and she seeks damages in the amount of $50,000.00 for loss of companionship and consortium.

The United States of America (government) contends that Mr. Hunter has not been permanently injured. The govern-

---

1. The breakdown of Mr. Hunter's damage claim is $21,500.35 for the stipulated out-of-pocket expenses, including lost wages and medical bills; $99,840.00 for total lost wage earning capacity; $10,725.00 for the total future reasonable medical expenses; and $117,934.65 for compensation for his bodily injury, pain and suffering, impairment, mental anguish, and loss of capacity to enjoy life.

ment argues that Mr. Hunter complains of the same injuries that he complained of before the accident. The government further states that the accident caused no real change in the condition of the Hunters' marriage. The government asserts, therefore, that neither Mr. Hunter nor Mrs. Hunter deserves the amount of damages each seeks.

### B. The Accident

■ On November 14, 1986, Mr. Hunter was involved in an automobile collision with a government-owned pickup truck. The accident occurred on the Cape Canaveral Air Force Base, Florida, at approximately 8:27 a.m. Eugene L. Lasek, a government employee, was driving the truck within the scope of his employment.[2] He had two passengers with him. Mr. Hunter was driving alone. Both vehicles were travelling within the posted speed limit and in opposite directions on Hanger Road, which is two-laned and level. The day was clear and the road was dry. The drivers and passengers were wearing seat belts. Impact resulted when Mr. Lasek turned left directly into Mr. Hunter's path. Mr. Lasek claimed that he did not see Mr. Hunter, but one of his passengers warned Mr. Lasek about Mr. Hunter moments before the crash. Because Mr. Lasek neither braked nor signaled before turning, Mr. Hunter could not avoid the collision. Plaintiff's Ex. 4A(f); Defendant's Ex. 21 at 8.

The police arrived at the accident scene and took statements. Mr. Lasek and his passengers were brought to the base infirmary and were released shortly thereafter in good condition. Mr. Hunter was taken to a nearby hospital, where he was physically examined, X-rayed, and prescribed medication. Since the collision, Mr. Hunter has complained of headaches, neck pain, shoulder pain, and lower back pain.

### C. Mr. Hunter's Pre–Accident Medical Complaints

Although Mr. Hunter complained of injuries after the accident, he complained of similar injuries before the accident. On May 4, 1982, Mr. Hunter went to Dr. Joseph E. Rojas, an orthopaedic surgeon, for headache treatment; Mr. Hunter had been having headache problems since 1980. The doctor examined Mr. Hunter and found him to have full range of motion in his neck. The doctor could not determine the cause of Mr. Hunter's headaches. On February 18, 1983, Mr. Hunter again visited Dr. Rojas's office for upper and lower back treatment, which was caused by a soft tissue strain. Mr. Hunter was still having headaches. Defendant's Ex. 23 at 5–9, 29, 45, 54.

Besides Dr. Rojas, Dr. David N. Greenblum, a psychiatrist, cared for Mr. Hunter. Mr. Hunter visited Dr. Greenblum six times during the months of October, November, and December 1985. Over the course of those three months, Mr. Hunter complained about headaches, shoulder pain, neck pain, leg pain, depression, insomnia, restlessness, lack of appetite, lack of sex drive, suicidal thoughts, difficulties with his family, and trouble socializing. Dr. Greenblum concluded that Mr. Hunter's psychological profile led him to be more vulnerable to physical and emotional stresses and less capable to endure pain than the average person. The doctor thought Mr. Hunter's headaches and leg pain were subjective problems that were related to tension rather than to an organic injury. Dr. Greenblum further concluded that Mr. Hunter's disturbed emotional state accentuated his pain. Defendant's Ex. 17 at 3–5, 7, 10–18, 25–26, 31, 35–37.

Mr. Hunter returned to Dr. Greenblum on January 7, 1986. Mr. Hunter had been severely depressed, had been occasionally crying, had suicidal thoughts, and had left his job because he could not concentrate. Owing to Mr. Hunter's worsened condition, Dr. Greenblum hospitalized him on January 8. While in the hospital, Mr. Hunter underwent a physical examination, which showed no organic problems. He was prescribed

---

**2.** When an employee of the United States government, operating a motor vehicle within the scope of his employment, negligently causes injury or damage to another, the injured party's sole and exclusive remedy is against the United States. *Garrett v. Jeffcoat,* 483 F.2d 590, 593 (4th Cir.1973); 28 U.S.C.A. § 2679(b)(1) (West Supp.1989); Doc. 4. Hence, Mr. Lasek was properly dropped as a defendant from this cause of action.

medication and was discharged three days later. During that same time period, Mr. Hunter and Mrs. Hunter were having marital problems. *Id.* at 17–21, 28.

Finally, on October 21, 1986, approximately one month before the car wreck, Mr. Hunter went to Dr. Gary R. Ostoski, a chiropractor. Mr. Hunter complained of headaches, neck stiffness, residual pain in his right hip and right leg, numbness in his right foot, and upper back pain. Plaintiff's Ex. 4A(g)(ix); Defendant's Ex. 15 at 14.

### D. Mr. Hunter's Post–Accident Medical Complaints

Shortly after the car accident, Mr. Hunter went to Dr. Rojas with complaints about headaches, dizziness, neck pain, and shoulder pain. Dr. Rojas examined Mr. Hunter and found no obvious neurological problems. The doctor thought that the accident had aggravated Mr. Hunter's pre-existing problems. Defendant's Ex. 23 at 9, 48. The same day, Dr. Rojas sent Mr. Hunter to Dr. Miguel R. Rivera, a neurologist and psychiatrist. Mr. Hunter complained of back and neck discomfort, pins and needles sensation in his arms, and right elbow pain. Dr. Rivera examined Mr. Hunter and discovered no neurological or neuromuscular abnormalities. Dr. Rivera determined that Mr. Hunter had suffered a cerebral concussion and whiplash from the accident; the injuries were not permanent. Defendant's Ex. 18 at 4–7, 25.

On December 4, 1986, Dr. Rivera performed on Mr. Hunter an electroencephalogram (EEG), an electromyogram (EMG), and nerve conduction studies for nerve damage. The results were normal. The doctor found Mr. Hunter's visually-evoked response to be normal and his brain stem auditory response to be normal as well. From those examinations, the doctor concluded that the collision had not caused permanent damage to Mr. Hunter's brain stem. *Id.* at 9–10.

Mr. Hunter visited Dr. Rivera for the last time on December 11, 1986. The doctor re-examined Mr. Hunter. The results were normal. Because Mr. Hunter had recovered from the accident-related injuries for which Dr. Rivera had been treating him, Mr. Hunter was discharged from the doctor's care. In Dr. Rivera's opinion, Mr. Hunter was physically able to return to work. *Id.* at 10–11, 25–27.

On March 11, 1987, Mr. Hunter went back to Dr. Rojas with complaints of severe headaches and muscle tightness. Dr. Rojas examined Mr. Hunter and found objective signs of muscle spasms and limited body motion. As a result of the examination, Dr. Rojas wrote a letter to Mr. Hunter's insurance company on March 23 notifying it that Mr. Hunter would be unable to return to work. At the time, Dr. Rojas thought Mr. Hunter would be able to resume working in about six weeks. Defendant's Ex. 23 at 14–15, 17–19, 30–31, 45. From the time of the accident, Mr. Hunter worked sporadically and eventually secured a steady job doing the same type of work he had done before the collision and at the same hourly wage.

Throughout March and into April 1987, Mr. Hunter returned to Dr. Rojas or went to the hospital emergency room for medication to relieve his headache and neck pain. On two occasions, Mr. Hunter demanded more powerful drugs from Dr. Rojas, but was refused. The doctor thought Mr. Hunter was probably becoming dependent on the narcotics. After Mr. Hunter was denied the stronger medication, he stopped going to Dr. Rojas for about eight months. On December 22, 1987, he returned to the office with complaints of severe headaches and tenderness over his spine. An associate of Dr. Rojas treated Mr. Hunter. *Id.* at 17, 20–28, 30, 32–35, 40, 43.

Apart from seeing Drs. Rojas and Rivera, Mr. Hunter also visited Dr. Ostoski soon after the accident. From the time of the collision until the time of the trial, Mr. Hunter had gone to Dr. Ostoski over ninety times for back pain and headache treatment. As a result of examining and caring for Mr. Hunter, Dr. Ostoski concluded that the car accident proximately caused permanent injury to Mr. Hunter. Dr. Ostoski has given Mr. Hunter a permanent impairment rating of thirteen percent.[3] In the doctor's

---

**3.** Dr. Ostoski has given Mr. Hunter the following permanent impairments: (1). Herniated

opinion, Mr. Hunter will experience further discomfort from his back injury in approximately five years. Dr. Ostoski has recommended that Mr. Hunter limit his physical activity. Plaintiff's Ex. 4A(g)(ix) and testimony.

While caring for Mr. Hunter, Dr. Ostoski referred him to Dr. Mark S. Storey, a neurologist, for other treatment.[4] From April 1987 to March 1988, Mr. Hunter visited Dr. Storey's office approximately forty times. During those visits, Mr. Hunter mentioned back pain twice.[5] He mainly complained about migraines and sought medication, often twice a day, for his headache pain. In September 1987, Dr. Storey hospitalized Mr. Hunter to alleviate his migraine suffering. Hospitalization brought relief for a few days, but the pain returned after Mr. Hunter was released. Mr. Hunter continued to go to Dr. Storey and to the hospital's emergency room for medication. In March 1988, Dr. Storey terminated Mr. Hunter as a patient; Mr. Hunter had attempted to get a narcotic injection despite Dr. Storey's rule requiring a patient who receives such an injection to have another person drive that patient home. The doctor had already warned Mr. Hunter about the policy after learning that Mr. Hunter had previously driven himself home after receiving a narcotic injection.[6] During the course of treating Mr. Hunter, Dr. Storey did not think that Mr. Hunter was pretending to have migraines. Dr. Storey noted that Mr. Hunter had suffered from migraines before the accident and that factors apart from the accident could have also caused their return. Defendant's Ex. 19 at 6, 9–42, 46–48, 74–78.

Before releasing Mr. Hunter from his care, Dr. Storey recommended that Mr. Hunter see Dr. Thomas F. Guidera, a clinical psychologist, for pain management therapy. Mr. Hunter first visited Dr. Guidera on December 23, 1987, with complaints of headaches, nausea, seeing spots, decreased appetite, trouble sleeping, depression, family problems, low enthusiasm, back pain, stress, and low libido. Those complaints persisted throughout the eighteen visits Mr. Hunter made to Dr. Guidera over the next three months. From treating Mr. Hunter, Dr. Guidera concluded that Mr. Hunter was suicidal, that his psychological profile was conducive to drug abuse, and that the car crash aggravated his depressive character trait. Moreover, Dr. Guidera thought that Mr. Hunter showed strong signs of anxiety and discomfort and that he was close to a mental breakdown. He thought that Mr. Hunter could return to work so long as the job involved no stress and no mental energy. Defendant's Ex. 20 and testimony.

Mr. Hunter also visited Dr. Glen P. Musselman, who practices in the field of orthopaedics. Mr. Hunter went to Dr. Musselman on September 16, 1988, and complained exclusively about pain in his right hip, which Mr. Hunter injured when he was fifteen years old. Dr. Musselman examined Mr. Hunter and found no neck difficulty, no restricted motion in his joints, no neurological changes in his legs, and no abnormalities in his pelvis or hip. Dr. Musselman concluded that Mr. Hunter's right hip pain was his only significant disability, and it "should be temporary" and "is easily treatable with injections." Defendant's Ex. 7.

In preparation for this lawsuit, the government hired Dr. Joseph V. Uricchio, an orthopaedic surgeon, to review Mr. Hunter's medical records. Based on the records, Dr. Uricchio detected no real difference in the type of complaints Mr. Hunter had before the accident with the type of

---

disc, L5/S1, 5% whole person; (2). Greater occipital nerve cephalgia, twice weekly, 3% whole person; (3). Cervical pain, C1–2 bilaterally, mild to moderate, 3% whole person; (4). Dorsal unilateral nerve root involvement, 3% whole person. Plaintiff's Ex. 4A(g)(ix). Although Dr. Ostoski had originally calculated Mr. Hunter's permanent injury to be eleven percent, he admitted his mathematical error during cross-examination. He added the figures again, came to fourteen percent, and rounded the total down to thirteen percent.

**4.** Dr. Mark Storey treated Mr. Hunter along with Dr. Ben Storey, who is Dr. Mark Storey's father.

**5.** Mr. Hunter has had back problems since 1978. Defendant's Ex. 15 at 28.

**6.** Mr. Hunter was also dismissed as a patient because he did not follow-up with the neurologist that Dr. Storey had sent him to for different migraine treatment. Defendant's Ex. 19 at 48.

complaints he had after the accident. He found no tests showing that the collision caused Mr. Hunter any specific pathology. In Dr. Uricchio's opinion, any change in Mr. Hunter's condition after the accident was insignificant and not permanent. Defendant's Ex. 15 at 20–21, 27, 32, 55–56.

### E. Mrs. Hunter's Claim of Loss of Consortium

Mrs. Hunter and Mr. Hunter were first married in December 1974 and were divorced five years later in July 1979. Several factors caused the divorce, mainly their immaturity and lack of communication. After the divorce, Mrs. Hunter went to Ohio and lived with her grandmother. She left the couple's infant son behind with Mr. Hunter. While in Ohio she met another man, and the two of them were wed shortly thereafter. The marriage lasted about four months and ended in divorce. Mrs. Hunter returned to Florida, and she remarried Mr. Hunter in August 1980.

After the car wreck in November 1986, Mrs. Hunter claimed her marriage to Mr. Hunter deteriorated. Mr. Hunter became reclusive and Mr. Hunter stopped talking to her. He was no longer working, and they were having financial difficulties. He was constantly depressed and usually in a stupor because of his overuse of medication and his occasional use of alcohol. According to Mrs. Hunter, during the eighteen months after the accident, Mr. Hunter was "worthless" to her financially, emotionally, and physically. Mrs. Hunter blamed the accident and Mr. Hunter's resulting injuries for causing their separation in June 1988 and their divorce in January 1989. Mrs. Hunter testified that she could never love Mr. Hunter as a husband again.

The government argued, in response, that the accident caused little variance in the Hunters' relationship. Before the collision, the Hunters experienced most, if not all, of the problems they encountered after the accident. For instance, their social life,

their sex life, and their inability to communicate remained unchanged.

## II. CONCLUSIONS OF LAW

### A. Federal Tort Claims Act

The Hunters brought this action under the Federal Tort Claims Act (FTCA). 28 U.S.C.A. §§ 1346(b), 2401(b), 2671–2680 (West 1965, 1976, & Supp.1989). For the Hunters to recover damages under the FTCA, Eugene L. Lasek must have been negligent. *Laird v. Nelms,* 406 U.S. 797, 798–99, 92 S.Ct. 1899, 1900, 32 L.Ed.2d 499 (1972); 28 U.S.C.A. § 1346(b).

#### 1. Duty and Breach.

■ Because the automobile accident occurred on the Cape Canaveral Air Force Base, the law of Florida will determine whether a legal duty has been breached and whether damages are available.[7] *Id.* Under Florida law, a driver of a vehicle who intends to make a left-hand turn into a driveway has the duty to "yield the right-of-way to any vehicle approaching from the opposite direction which is … so close … as to constitute an immediate hazard." Fla.Stat.Ann. § 316.122 (West 1990). Mr. Hunter was close enough to Mr. Lasek "to constitute an immediate hazard," a conclusion evident from the collision occurring moments after Mr. Lasek made the turn. Because Mr. Lasek turned without warning, Mr. Hunter lacked adequate time to see and avoid the danger. By failing to yield to Mr. Hunter, Mr. Lasek violated Mr. Hunter's right-of-way and caused the impact. Accordingly, Mr. Lasek was singly negligent for the collision.

#### 2. Proximate Cause of Injury.

■ Florida law allows a plaintiff to "recover damages in tort for pain, suffering, mental anguish, and inconvenience because of bodily injury, sickness, or disease arising out of" a car accident "only in the event that the injury or disease consists in whole or in part of [a] permanent injury within a

---

**7.** "[T]he choice of law is not affected by the fact that the claim in question arises on federal property, such as a military installation, within

a state." *Orr v. United States,* 486 F.2d 270, 275 (5th Cir.1973).

reasonable degree of medical probability, other than scarring or disfigurement." *Id.* § 627.737(2)(b) (West 1984). If the threshold requirement of permanent injury is not reached, a court cannot "award general damages for pain, suffering or any of the other elements of damages set forth in section 627.737(2)." *Eley v. Moris,* 478 So.2d 1100, 1103 (Fla.Dist.Ct.App.1985); *accord McClellan v. Industrial Fire & Casualty Ins. Co.,* 475 So.2d 1015, 1016 (Fla.Dist.Ct.App.1985).

Although section 627.737(2) does not define permanent injury, "the determination of what constitutes a permanent injury must, as a practical matter, be left to physicians trained in that profession." *Morey v. Harper,* 541 So.2d 1285, 1288 (Fla.Dist.Ct. App.), *rev. denied,* 551 So.2d 461 (Fla.1989). "Hence, the language requiring proof of a permanent injury based on a reasonable degree of medical probability has established a requirement that can only be satisfied by expert medical testimony." *Id.* If the expert testimony is uncontradicted and pertains to subjects for experts alone, this court is bound to follow that testimony. *See id.; Martin v. Young,* 443 So.2d 293, 294 (Fla.Dist.Ct.App.1983) (per curiam); *Avis Rent–A–Car Sys., Inc. v. Stuart,* 301 So.2d 29, 29–30 (Fla.Dist.Ct.App.1974). In the case at hand, however, the experts disagreed about the permanence of Mr. Hunter's injuries. Dr. Ostoski claimed that Mr. Hunter had suffered a thirteen percent physical impairment, whereas Dr. Uricchio found no significant difference between Mr. Hunter's pre- and post-accident conditions. Because the expert testimony is contradictory, this court, as finder of fact, may choose to believe the expert it considers most credible.[8]

### (a) Lower Back Injury.

To show permanent injury to Mr. Hunter's lower back, Dr. Ostoski pointed to two CAT–Scans. One was performed on Mr. Hunter before the accident, and the other was taken after the accident. Dr. Ostoski determined that the October 30, 1986, CAT–Scan indicates a centrally herniated L5/S1 disk and that the February 18, 1988, CAT–Scan shows that the same disk has been lateralizing to the left. In Dr. Ostoski's opinion, the difference in Mr. Hunter's L5/S1 disk is striking and demonstrative of lasting injury. Plaintiff's Ex. 4A(g)(ix) and testimony.

Dr. Uricchio disagreed with Dr. Ostoski's conclusion and stated that Mr. Hunter's CAT–Scans are "within the range of normal" and reflect only "modest" or "subtle changes" in his condition over time. Defendant's Ex. 15 at 18, 32. He noted that although CAT–Scans can be informative

> they're notoriously difficult to read in that, ..., you're often reading very subtle changes of light gray against dark gray. It's a little hard to be certain or specific and you have to understand, also, that in the normal asymptomatic population, the population that does not have any complaints, something like 35 to 40 percent already have some CAT scan abnormality, such as disk prominence or protrusion at L–5, S–1.

*Id.* at 18.

Dr. Uricchio's suspicion regarding the value of CAT–Scans was supported by Dr. Ostoski, who admitted that CAT–Scans have an inherent expected error rate of thirty percent. Besides, Dr. Uricchio observed that if Mr. Hunter's lateralized disk were severe enough to produce a pathological condition, he should be symptomatic on his left side. Dr. Ostoski concurred. Nevertheless, Mr. Hunter's long-termed complaints have been about pain to the right side of his body. *Id.* at 19–20. Based on this information, the court agrees with Dr. Uricchio's assessment of the CAT–Scans, especially in light of Mr. Hunter's injury to his lower back as a teenager. Therefore, this court does not find the CAT–Scans to have demonstrated permanent injury to Mr. Hunter.

---

**8.** *Burton v. Powell,* 547 So.2d 330, 332 (Fla. Dist.Ct.App.1989) ("[A] jury is free in the ordinary negligence case to accept or reject the testimony of a medical expert...."); *Eley,* 478 So.2d at 1103 (when medical testimony conflicts, a jury is free to believe either expert); *Fay v. Mincey,* 454 So.2d 587, 594 (Fla.Dist.Ct.App. 1984) ("The credibility of expert witnesses and the weight of their opinion testimony are for the jury to determine.").

Dr. Ostoski also used two EMGs that were performed on Mr. Hunter to establish permanent injury. The EMGs were taken on two different parts of Mr. Hunter's anatomy and on two different occasions. The first EMG, taken on December 4, 1986, studied Mr. Hunter's upper back and neck and was negative for injury to those areas. The second EMG, taken on March 18, 1988, studied Mr. Hunter's lower back and showed partial denervation to his left lower back, right calf, and left hamstring. *Id.* at 16, 55–56. Dr. Ostoski thought the second EMG illustrated a permanent injury to Mr. Hunter.

Yet, as Dr. Uricchio pointed out, the latter EMG suggests a change to Mr. Hunter's left side, which should have brought about pain in that area. Because Mr. Hunter has continually complained only about pain to his right side, the doctor could not clearly relate the change demonstrated by the EMG to Mr. Hunter's present condition. *Id.* at 52. Moreover, although Dr. Ostoski emphasized the significance of the denervation, the denervation does not necessarily mean that the car collision caused it. The injury could have resulted from another mishap, at another time. Because the two EMGs fail to compare Mr. Hunter's condition before the collision with Mr. Hunter's condition after the collision and because Mr. Hunter is asymptomatic on his left side, this court agrees with Dr. Uricchio and does not consider the EMGs useful in showing that the accident caused Mr. Hunter lasting injury.

### (b) Neck and Shoulder Injury.

Dr. Ostoski contended further that Mr. Hunter suffers from permanent neck and shoulder injuries. Dr. Ostoski contributed Mr. Hunter's neck and shoulder pain to muscle spasms and muscle swelling. In contrast, Dr. Uricchio did not consider spasms and swelling to be objective signs of permanent injury to Mr. Hunter's neck and shoulders. Dr. Uricchio acknowledged that muscle spasms could have reasonably occurred for a period of time after the accident, but he rejected the opinion that a person would get a muscle spasm years after the initial injury. *Id.* at 41–42. Dr. Uricchio also thought that muscle spasms are "very difficult to document and to, ..., measure, and to demonstrate, and ... it's open to a lot of, ..., clinical misrepresentation...." *Id.* at 41. In addition, Dr. Uricchio discovered no tests in Mr. Hunter's medical records to show any specific pathology to Mr. Hunter's neck. He also found no difference in the types of complaints Mr. Hunter had before the accident with respect to his shoulders and upper back. The court agrees with Dr. Uricchio's conclusions and recognizes that the muscle spasms and swelling could have occurred from something other than the collision.

### (c) Headache Pain.

Dr. Ostoski also asserted that Mr. Hunter suffers from permanent headache pain, which he thought the concussion caused. Dr. Uricchio disagreed. He found no variance between the type of headache Mr. Hunter complains of now and the type of headache he complained of before the accident. *Id.* at 20. The court believes Dr. Uricchio. Mr. Hunter suffered from migraines before the accident, and migraines can reoccur for many reasons such as tension at work and stress at home.[9] Defendant's Ex. 19 at 74–78 & Ex. 20.

### 3. Expert Credibility.

The court considers Dr. Uricchio the more credible expert witness because he examined Mr. Hunter's medical history before reaching his opinion. Dr. Ostoski, on the contrary, only viewed Mr. Hunter's condition from the time of the accident forward without taking a complete medical history of Mr. Hunter. As a result, Dr. Ostoski could not establish whether Mr. Hunter's condition was continuing, was caused by the collision, or was a result of a recent misfortune. Unlike Dr. Ostoski, Dr. Uricchio compared and contrasted Mr. Hunter's present condition with his past condition and, as such, was in a better

---

9. This court recognizes that between March 1987 and April 1988 Mr. Hunter visited doctors mainly for headache treatment. During that time period, Mr. Hunter became dependent on drugs. Mr. Hunter's condition of chemical re- liance raises the question of whether Mr. Hunter's need for medication derived from the headaches or whether his claim of headaches derived from his need for medication.

position to state whether Mr. Hunter now suffers from new or residual problems.

This court also does not give much credence to Dr. Ostoski's opinion because he based his rating of permanent injury primarily on Mr. Hunter's subjective complaints of pain. Defendant's Ex. 15 at 52–53. Subjectivity alone is not helpful in determining the extent and permanency of injury, because it cannot be easily verified. To make the most precise determination, this court requires findings of objective injury that occurred from the collision.[10] The evidence in this case has not convinced the court that Mr. Hunter suffered any significant new or permanent injury from the accident.

### 4. Damages.

In sum, this court adopts Dr. Uricchio's conclusions rather than those of Dr. Ostoski. The court detects no real difference between the type of complaints Mr. Hunter had before the accident and the type of complaints he had after the accident. Consequently, the court concludes that the collision did not permanently injure Mr. Hunter within a reasonable degree of medical probability. Still, the accident aggravated Mr. Hunter's pre-existing problems and gave him a concussion and whiplash. Those injuries caused Mr. Hunter to seek medical assistance and to be absent from work. The government, therefore, must compensate Mr. Hunter for the financial losses that stemmed from those non-permanent injuries.[11]

The court acknowledges the basic principle of tort law that a defendant takes his victim as he finds him. The court understands that Mr. Hunter is more vulnerable to physical and emotional stresses than the average person, that Mr. Hunter is less able to endure pain, and that Mr. Hunter is more likely to abuse pain killers. Nonetheless, the nature of Mr. Hunter's physical and emotional capacities does not give him a license to receive more damages than he deserves. Because Mr. Hunter probably took longer to recover from the non-permanent injuries than would the average person, the court awards him full compensation for his out-of-pocket expenses. Without objective signs of permanent injury, the court will not extend the basic principle of tort law any further.

In addition, this court does not award Mr. Hunter any future earnings, because it does not find his non-permanent injuries to have diminished his capacity to labor. *See Hubbs v. McDonald,* 517 So.2d 68, 69–70 (Fla.Dist.Ct.App.1987) (per curiam); *Allstate Ins. Co. v. Shilling,* 374 So.2d 611, 612–13 (Fla.Dist.Ct.App.1979) (per curiam). The court does not award Mr. Hunter any damages for his claim of future medical expenses, because it does not find that his non-permanent injuries are reasonably certain to require such treatment. *Cf. Wages v. Snell,* 360 So.2d 807, 809 (Fla.Dist.Ct. App.1978) (per curiam) (injury must be reasonably certain to impair future health of injured person, not simply appear to affect future health).

---

**10.** *Laberge v. Vancleave,* 534 So.2d 1176, 1177 (Fla.Dist.Ct.App.1988), *rev. denied,* 545 So.2d 1369 (Fla.1989) ("Because the claimed injury was subjective (not based on organic evidence), it is obvious the jury could have disbelieved the plaintiff's claims of continued pain."); *Jones v. Smith,* 547 So.2d 201, 202 (Fla.Dist.Ct.App.1989) (Nesbitt, J., dissenting) (section 627.737(2) does not mention any subjective elements of injury). *Contra Johnson v. Phillips,* 345 So.2d 1116, 1117 (Fla.Dist.Ct.App.1977), *cert. denied,* 358 So.2d 131 (Fla.1978) (holding that the threshold requirement of "permanent injury" in section 627.737(2) includes "permanent subjective complaints of pain resulting from an initial organic injury.") Although the facts in *Johnson* are similar to the instant action, the medical testimony in *Johnson* was uncontroverted. The medical opinion in the case at hand differs. When ex-

pert testimony is contradictory, the court may follow the opinion of the expert it deems the most credible, which in this case is Dr. Uricchio. He concluded that Mr. Hunter has not experienced new headache problems from the accident. *See also Jones,* 547 So.2d at 201–02 (applying the holding in *Johnson* ).

**11.** *Chapman v. Dillon,* 415 So.2d 12, 18–19 (Fla. 1982) (even though not permanently injured, plaintiff may still recover out-of-pocket expenses); *Hamblen v. Owens,* 127 Fla. 91, 95–97, 172 So. 694, 696 (1937) (award of damages is recover out-of-pocket expenses); *Hamblen v. Owens,* 127 Fla. 91, 95–97, 172 So. 694, 696 (1937) (award of damages is appropriate for aggravating existing ailments); *McClellan v. Industrial Fire & Casualty Ins. Co.,* 475 So.2d 1015, 1016 (Fla.Dist.Ct.App.1985) (adopting *Chapman* ).

## B. Loss of Consortium

■ Mrs. Hunter's claim of loss of consortium derives from Mr. Hunter's claim. *Gates v. Foley*, 247 So.2d 40, 45 (Fla.1971). Because Mr. Hunter did not suffer permanent injury, Mrs. Hunter is not entitled to recover damages on her claim. *Faulkner v. Allstate Ins. Co.*, 367 So.2d 214, 217 (Fla.1979); *McDaniel v. Prysi*, 432 So.2d 174, 175 (Fla.Dist.Ct.App.1983). Mrs. Hunter's "loss of pure 'consortium,' now a nebulous intangible in the first place, would be presumptively *de minimis* in almost all cases in which the injured party did not reach the threshold, the personal injuries being presumably minor." *Faulkner v. Allstate Ins. Co.*, 333 So.2d 488, 491 (Fla.Dist.Ct.App.1976), *aff'd in part, rev. in part*, 367 So.2d 214 (Fla.1979) (emphasis in original).

■ This court, moreover, remains unconvinced that the accident caused any meaningful change in the Hunters' marriage. Their relationship before and after the accident was comparable. Any marital problems they experienced were more a result of their own shortcomings than the result of the car crash. *See Hagens v. Hilston*, 388 So.2d 1379, 1381 (Fla.Dist.Ct.App.1980) (attitude of parties, not accident, could reasonably have caused marital problems). To succeed on a loss of consortium claim, the Hunters had to prove that the accident harmed "the companionship and fellowship of husband and wife and the right of each to the company, cooperation and aid of the other in every conjugal relation." *Gates*, 247 So.2d at 43. According to the Florida Supreme Court, "[c]onsortium means much more than mere sexual relation and consists, also, of that affection, solace, comfort, companionship, conjugal life, fellowship, society and assistance so necessary to a successful marriage." *Id.* This court does not find Mrs. Hunter to have afforded Mr. Hunter—or him, her—the consortium necessary to assure a successful relationship. As such, Mrs. Hunter is awarded no damages.[12]

## C. Summary and Conclusion

The accident did not cause permanent injury to Mr. Hunter within a reasonable degree of medical probability. Therefore, he does not satisfy the threshold requirement of Florida Statutes section 627.737(2). Mr. Hunter deserves restitution only for the financial losses that occurred from his non-permanent injuries. To compensate him fully, the government is ordered to pay Mr. Hunter the stipulated amount of $21,-500.35. Mrs. Hunter's claim of loss of consortium fails because Mr. Hunter was not permanently injured and because the court perceived no significant change in her relationship with Mr. Hunter after the collision. Mrs. Hunter is due nothing. The Hunters are awarded their costs in this action excluding attorneys' fees.[13]

Accordingly, the clerk of the court shall enter judgment against the government in the amount of $21,500.35 plus the Hunters' costs.

It is SO ORDERED.

---

12. *Cowart v. Kendall United Methodist Church*, 476 So.2d 289, 291 (Fla.Dist.Ct.App.1985) (it is legally consistent to award injured person damages and not award damages in derivative claim of loss of consortium when evidence is insufficient or conflicting). Under Florida law, even if Mrs. Hunter had presented substantial and undisputed testimony that the accident caused a drastic change in her lifestyle, this court would only be required to award her nominal damages. *E.g., DeLong v. Wickes Co.*, 545 So.2d 362, 365–66 (Fla.Dist.Ct.App.1989).

13. *Joe v. United States*, 772 F.2d 1535, 1536–37 (11th Cir.1985) (per curiam) (Federal Tort Claims Act and Equal Access to Justice Act preclude awarding attorneys' fees against the United States); 28 U.S.C.A. §§ 1920, 2412(a)–(b), (d)(1)(A), 2678 (West 1966 & Supp.1989); Fed.R. Civ.P. 54(d).